**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SEMLER SCIENTIFIC, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:19-CV-1448** |
| | § | |
| **TRAVIS GAINES and HYPERION** | § | |
| **MEDICAL TECHNOLOGIES, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiff Semler Scientific, Inc. ("Semler" or "Company") files this Original Complaint against Defendants Travis Gaines ("Gaines") and Hyperion Medical Technologies, Inc. ("Hyperion") (collectively, "Defendants") and respectfully shows the Court as follows:

## I.  INTRODUCTION & SUMMARY

1.      Semler is a medical technology company that invests significant resources on developing, manufacturing, and marketing innovative proprietary products and services that assist healthcare providers in the evaluation and treatment of chronic diseases.  Defendants Hyperion and Gaines seek to benefit from Semler's substantial investment by unlawfully using Semler's trade secrets to gain an unfair competitive advantage in the industry at Semler's expense.

2.      Semler brings this action against a former Regional Account Manager (Gaines) who was entrusted with access to all manner of Semler's confidential and proprietary information, including the proprietary details of Semler's products and technology, pricing and billing information, and customer and prospective customer lists with contact information, along with other trade secret information.  As a condition of his employment with Semler, Gaines signed the

Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Confidentiality Agreement") on April 10, 2017.  Instead of adhering to his obligations to keep Semler's proprietary information confidential, Gaines sought (and Hyperion allowed him) to use Semler's proprietary information for their personal interest and benefit to the actual detriment of Semler.  In doing so, Gaines breached the Confidentiality Agreement, and Gaines and Hyperion (which sells a blood flow test directly competitive to Semler's product) misappropriated Semler's trade secrets and committed multiple other violations of state and federal law.

3.      Semler has suffered and will continue to suffer damages if Defendants are not restrained from their unlawful and tortious conduct.  Semler seeks damages in addition to injunctive relief to prevent the ongoing misappropriation of its trade secrets and breach of the Confidentiality Agreement.

## II. PARTIES

4.      Plaintiff Semler Scientific, Inc. is a corporation incorporated in the State of Delaware, with its principal place of business located at 911 Bern Court, Suite 110, San Jose, CA 95112.

5.      Defendant Travis Gaines is an individual resident of the State of Texas whose last known address is 25455 Borough Park Drive #312, Spring, TX 77380.  Gaines was previously employed as Semler's Regional Account Manager in the Houston, Texas area.

6.      Defendant Hyperion Medical Technologies, Inc. is a corporation incorporated in the State of Texas, with its principal place of business located at 15914 Midway Road, Addison, Texas 75001-4261.  Hyperion Medical Technologies, Inc. can be served through its registered agent, Scott Day, at 15914 Midway Road, Addison, Texas 75001.

2

### III.  JURISDICTION AND VENUE

7.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. Semler asserts causes of action under federal law under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.* and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. This Court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331.  In the alternative, this Court also has subject-matter jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the minimal jurisdictional amount of $75,000 and there is complete diversity between the parties.  This Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367, because the state law claims are so closely related to the DTSA and CFAA claims that they constitute part of the same case or controversy.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside or conduct business in this district and because all or a substantial part of the events giving rise to this action occurred in this district.

9.     This Court has personal jurisdiction over Defendant Hyperion Medical Technologies, Inc. because it is a corporation incorporated in Texas and regularly conducts and solicits business with the State of Texas and this district.  This Court has personal jurisdiction over Defendant Gaines because he is a Texas resident in this district.  This Court further has personal jurisdiction over all Defendants because the conduct from which this action arises occurred in this district.

201934064 v3

## IV. FACTUAL ALLEGATIONS

### A. *Semler's Business*

10.    Semler is a medical technology company focused on developing, manufacturing, and marketing innovative proprietary products and services that assist healthcare providers in evaluating and treating chronic diseases.

11.    Semler currently markets one patented and FDA-cleared vascular-testing product, QuantaFlo.  QuantaFlo is a four minute in-office blood flow test used by healthcare providers to measure a patient's blood flow as part of their examination of a patient's vascular condition, including assessments of patients who have vascular disease (including, but not limited to, peripheral arterial disease, or PAD).  Semler previously marketed a product called FloChec, which was the predecessor to QuantaFlo, but has phased that product out over time and replaced it with QuantaFlo.

12.    To market its products and technologies, including QuantaFlo, Semler employs a network of sales representatives and regional account managers throughout the country, including in the Houston, Texas area.  These employees research the market and network to find potential Semler customers, introduce such potential customers to Semler products and technologies, maintain relationships with existing customers, and develop sales strategies using Semler's proprietary information, the majority of which is maintained in electronic format.  Semler continues to invest significant resources and effort into growing its customer base.

13.    Semler sells QuantaFlo to healthcare insurance plans, integrated delivery networks, independent physician groups, and companies contracting with the healthcare industry such as risk assessment groups, in addition to doctors' offices.  Instead of making traditional equipment sales,

4

Semler licenses QuantaFlo to its customers, who can elect to license QuantaFlo from Semler on a month-to-month or annual basis.  As of November 26, 2018, Semler had a significant number of existing customers who had licensed usage of QuantaFlo from Semler.

### B.  Semler's Protection of Confidential and Proprietary Information

14.     Semler compiles and maintains information on the proprietary details of its products and technologies, including, but not limited to how its products differ from those of its competitors, organizational models, personnel data, future business forecasts, plans and strategy, sales strategy and forecasts, pricing and billing details, customer lists, customer contract information, customer preferences, customer technical requirements, customer relationship and negotiation history, and potential customer contacts.  All of this information is proprietary to Semler and is treated as confidential by the Company.  In addition, Semler prides itself on its relationships with its customers and that relationship forms the basis of its customer goodwill and the Company's competitive advantage in the marketplace.

15.     Maintaining the secrecy and confidentiality of the information described in the preceding paragraph is critical to the success of Semler's business and is something Semler takes seriously.  Semler takes reasonable steps to maintain the confidentiality of this information and entrusts it only to a handful of employees.  Semler uses computer systems which are secured through username and password combinations.  In addition, much of Semler's confidential information is stored in cloud-based secure systems which require authenticated credentials to access, such as Dropbox Business and Salesforce.  Access to such systems is limited and a unique username and password combination is required by each user.

16.     Semler uses Dropbox Business to store and manage a range of confidential and proprietary information, the unauthorized disclosure of which would be highly detrimental to the

5

Company's business.  The data maintained on Dropbox Business includes proprietary materials regarding its products, technical information relating thereto, clinical research (including trial data and protected personal health information about patients and other individuals), case studies, information relating to the efficacy of QuantaFlo's products as compared to those of its competitors, product utilization reports, sales strategy, forecasts, and reports, details regarding the structure and operations of Semler's sales team, training materials, notes and recordings of internal business meetings, billing and pricing information, customer information (including customer contracts), and prospective customer information.  To safeguard this information and protect its confidentiality, the Dropbox Business account is password-protected.

17.    Semler also uses Salesforce to store and manage information that it considers to be some of its most confidential and proprietary, the unauthorized disclosure of which would be highly detrimental to the Company's business.  Such information maintained on Salesforce includes customer lists, customer contact information, relationship and negotiation history with customers, pricing and billing information, and prospective customer contact information.  To safeguard this information and protect its confidentiality, the Salesforce database is password-protected.

18.    All employees who have access to Semler's confidential and proprietary information and trade secrets, including access to such information on the Dropbox Business and Salesforce databases, are required to sign the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Confidentiality Agreement"), in which employees agree to not improperly use or disclose Semler's confidential or proprietary information or trade secrets, and to return all Company information and/or documents upon termination of employment, among other obligations.  Numerous provisions of

6

the Confidentiality Agreement convey the priority the Company places on safeguarding its trade secrets and proprietary information.

19.     Section 2.A of the Confidentiality Agreement governs the confidentiality of Semler's confidential and proprietary information and provides as follows:

> *Company Information.* I agree that during and after my employment with the Company, I will hold in the strictest confidence, and will not use (except for the benefit of the Company during my employment) or disclose to any person, firm, or corporation (without written authorization of the President, CEO, or the Board of Directors of the Company) any Company Confidential Information. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that "**Company Confidential Information**" means any non-public information that relates to the actual or anticipated business, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information; provided, however, Company Confidential Information does not include any of the foregoing items to the extent the same have become publicly known and made generally available through no wrongful act of mine or of others. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

20.     Section 2.C of the Confidentiality Agreement governs the confidentiality of confidential or proprietary information Semler receives from third parties and provides as follows:

> *Third Party Information.* I recognize that the Company may have received and in the future may receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information

7

("**Associated Third Party Confidential Information**"). By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter to hold in the strictest confidence, and not to use or to disclose to any person, firm, or corporation, any Associated Third Party Confidential Information, except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

21.     Under Section 4.A of the Confidentiality Agreement, employees agree not to engage in conflicting work during their employment.  Section 4.A states:

> *Current Obligations*. I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

22.     Section 5 of the Confidentiality Agreement governs the terms related to the return of all Semler property and information when an employee separates from employment with the Company.  It states:

> *Returning Company Documents*. Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices,

8

telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any and all of the aforementioned items that were developed by me pursuant to my employment with the Company, obtained by me in connection with my employment with the Company, or otherwise belonging to the Company, its successors, or assigns, including, without limitation, those records maintained pursuant to Section 3.C.  I also consent to an exit interview to confirm my compliance with this Section 5.

23.    Upon separation from employment with the Company, employees may also be required to sign and deliver to the Company a "Termination Certification," which certifies that the employee has returned all Company property and information, complied with the terms of the Confidentiality Agreement, agreed to keep proprietary Semler information confidential, and agreed not to solicit the Company's employees to leave their employment.   The Termination Certification provides:

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Semler Scientific, Inc., its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer

9

programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment, or to enter into an employment, consulting, contractor, or other relationship with any other person, firm, business entity, or organization (including with myself).  I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Section 2A thereof.

24.     Semler also maintains Conflict of Interest Guidelines, which are set forth in Section 9 of the Confidentiality Agreement and by which employees agree to abide.  Among the Conflict of Interest Guidelines are that the employee agrees to avoid "[r]evealing confidential information to outsiders or misusing confidential information.  Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended."

## C. *Gaines's Role at Semler, His Access to Semler's Confidential and Proprietary Information, and Resignation*

25.     Semler hired Travis Gaines in April 2017 as a Regional Account Manager in the Houston, Texas area.  His start date was May 1, 2017.  As a Regional Account Manager, Gaines was responsible for all sales and support functions for prospective, new, and current customers in his territory.  His primary job, in addition to selling Semler products and services, was to manage client relationships, by both maintaining existing relationships and generating new clients and prospects.

26.     In the course and scope of his work, Gaines had access to all manner of Semler's proprietary and confidential information, including the highly complex and proprietary details of

10

the Company's products and technology, how its products differ from those of its competitors, pricing and billing information, customer and prospect lists (including contact information), the terms of Semler's customer contracts, Semler's relationships and negotiation history with customers and prospects, customer habits and preferences, customer technical requirements, discounts offered to customers, and business and strategic models and plans.  Gaines signed the Company's Confidentiality Agreement on April 10, 2017.

27.     In his role, Gaines had a direct supervisor named Lisa Cabrera, who in turn reported to Cindy Guinasso, the Vice President of Business Development at Semler.  At the time of his hire, Gaines did not have a preexisting client relationship with any of Semler's customers.   Ms. Guinasso personally introduced him to many of Semler's Texas customers and gave him may of the potential customer leads she had generated in the Texas region.

28.     The customer and lead information provided to Gaines is confidential information to which he would not have been privy but for his employment with Semler.  Semler does not publicly disclose the identity of such customers or prospective customers, information which Semler spent nine years developing prior to providing the information to Gaines.   More specifically, these contacts were carefully culled by Ms. Guinasso through her own networking and research efforts and such contacts were closely guarded by Semler.  This list of individuals would not be known to the public or industry, since QuantaFlo is not designed for use by an easily identifiable subset of the medical profession.  Rather, doctors of varying specialties may have needs for this product.  The list provided to Gaines was a list of those healthcare providers whom Semler knew, through the prior efforts of Ms. Guinasso and her team, were customers or potential customers interested (or may be interested) in using QuantaFlo.

11

29.     In addition to his sales responsibilities, one of Gaines's job duties was account management.  It was clearly communicated to him that he was expected to regularly update account information on Salesforce, so that other Semler personnel could easily take over Gaines's accounts should he fall ill or go on vacation.  Gaines's supervisor repeatedly warned Gaines that he was failing to properly carry out these vital account management tasks.  For example, Gaines's notes regarding various client interactions were often not properly filled out or were too difficult to follow.

30.     On September 28, 2018, Gaines was again counseled on his failure to adequately perform these account management tasks.  He was placed on a 30-day performance improvement plan.

31.     Gaines's initial reaction was to admit fault and accept the feedback.  But rather than work to improve his performance, on November 3, 2018, Gaines gave notice by email that he was resigning from his employment, effective November 26, 2018.

32.     Gaines's resignation came as a complete surprise to Semler.  In an exit interview, Gaines told Ms. Guinasso that he did not have a job lined up but rather intended to spend time with family.  He mentioned he might work with a friend who lived outside the United States to import a medical product related to Gaines's prior job (which was not related to Semler's products).

33.     Upon his separation from the Company, Gaines signed a Termination Certification, representing that he had returned all Company property and information, complied with the Confidentiality Agreement, and would continue to preserve as confidential all Company information.  Gaines returned his Company-issued laptop and mobile device and stated on the Termination Certification that, moving forward, he would be "self-employed" as a "1099 Independent Medical Sales Consultant."

12

**D.**   ***Defendants' Unlawful Usage of Semler's Proprietary Information and Gaines's Unauthorized Copying, Retention, and Destruction of Semler Documents, Property, and Information***

34.      Shortly after Gaines's resignation, multiple clients informed Semler that Gaines was contacting them to sell a product called Smart-ABI, a new product that was directly competitive to QuantaFlo and which was being developed by Defendant Hyperion Medical Technologies, Inc.   The customers who revealed that Gaines had contacted them were all customers to whom Gaines was introduced through Semler, had been developed by Ms. Guinasso and her team's efforts over the previous nine years, and about whom Gaines learned significant confidential information during his employment with Semler.   The identity and contact information of these customers was not known to the public or industry at large.

35.      Both QuantaFlo and Smart-ABI are diagnostic blood flow tests that measure arterial blockages in the lower extremities.   Both products require equipment to facilitate the underlying testing.   Both are used to test for vascular disease, including peripheral arterial disease.   These products are in direct competition with each other, as they perform the same functions and any customer would only have need for one such diagnostic device.

36.      Upon information and belief, Gaines could not have solicited these customers and would not have known which prospective customers to call about Smart-ABI without using Semler's confidential information.   A sales person who had never worked for Semler would not have known to call Semler's customers as prospective users of Smart-ABI and would not have had the intimate knowledge of Semler's products and pricing information, as well as its customers' quirks, habits, negotiation patterns, purchasing patterns, and historical relationships to which Gaines was privy due exclusively to his employment with Semler.   Multiple Semler customers reported to Semler that Gaines had contacted them to sell Smart-ABI.   Such clients expressed to

Semler that Gaines referenced the Semler confidential information detailed above in asking them to switch from QuantaFlo to Smart-ABI.

37.     One Semler customer reported that Gaines had demonstrated Hyperion's product, Smart-ABI, to that customer prior to Thanksgiving 2017, ***while Gaines was still employed by Semler***.  The customer even asked Gaines if it was appropriate for him to market this competing product while still employed by Semler.  The customer reported that Gaines responded that he was not bound by a non-compete and could therefore demonstrate the product.  This representation by Gaines was in callous disregard for his obligations under Section 4.A of the Confidentiality Agreement.

38.     In the sales industry, a demonstration only takes place after a salesperson has been on-boarded by the company and given the relevant product and sales information, business cards, and other marketing materials.  Thus, upon information and belief, Gaines could only have been demonstrating Hyperion's product if he was already engaged by Hyperion as an employee or consultant while he was still employed by Semler.

39.     Since Gaines' November 26, 2018 resignation, Semler has lost an unprecedented number of customers, including 12 customers that Semler has confirmed transferred their business to Hyperion.  Many of these cancellations occurred soon after Gaines's resignation date.

40.     While Semler licenses QuantaFlo to its customers, Semler's conversations with its customers who have been contacted by Gaines and Hyperion indicate that Hyperion sells Smart-ABI to its customers through a lease-to-own model that involves a capital equipment sale (which requires financing through a third-party equipment leasing company).  Thus, customers who switch from Semler to Hyperion are likely required to take on a long-term financial commitment to a third party, meaning that Semler has little chance of recovering these customers.  In fact, when

14

one Semler customer whom Gaines convinced to switch over to Hyperion accidentally emailed Gaines at his Semler email address rather than his Hyperion email address, Semler inadvertently learned of this financing arrangement through a third-party leasing company.  Semler also learned of Hyperion's lease-to-own model from Semler customers who contacted Semler after Mr. Gaines solicited such customers to switch to Hyperion's product.

41.    In December 2018, Semler learned that Gaines had deleted a large number of Semler files from the Company-issued laptop and mobile device he returned upon his termination. In particular, Semler's IT department informed Ms. Guinasso that Gaines had deleted all of his email correspondence from May 2018 through November 2018 from his Company-issued laptop and email account, as well as some of the call history on his Company-issued mobile phone.  No one from Semler instructed him to delete such information, nor would he have had any legitimate reason to do so.

42.    In that same month, Semler's IT department used a program called AutoSpy to conduct an initial forensic analysis of the contents of Gaines's Company-provided laptop.  The resulting report revealed that, in his last days of employment with Semler, Gaines was downloading Semler's clinical data, customer lists and contact information (both in aggregate form, as well as for Gaines's region and for other employees' regions), Semler order forms, pricing information, and Semler training materials.  Gaines would not have any need nor legitimate Semler-related business purpose to download much of this content, as it was unrelated to his work, particularly in his last few days of employment.  Upon information and belief, it appears that Gaines downloaded this material *en masse* in order to transfer it to external storage media for later unauthorized access, knowing that he would be resigning from Semler.

43.     The AutoSpy report also indicated that, during his last month of employment, Gaines downloaded and reviewed Hyperion-related materials, including business cards, order forms, and territory "split lists."

44.     On March 22, 2019, Semler received a report from an independent forensics examiner, TransPerfect Legal Solutions ("TLS"), that had been retained to perform a detailed forensic examination of the Semler-issued laptop used by Gaines during his Semler employment, an HP EliteBook 850G3 laptop.  Semler engaged TLS to determine whether Gaines had taken any Semler confidential information with him upon his departure.  The report confirmed that, in the last days of his employment, Gaines was accessing a number of Semler files that he had no need to access, including customer and prospective customer contact information, customer contracts, studies that Semler had conducted on QuantaFlo (which contained protected patient health information and other highly sensitive clinical data), regulatory and training materials, competitor profiles, sales reports and customer lists for other Semler sales regions, and organizational charts. Many of these files were unrelated to his job duties generally and unrelated to any work he was performing in the last days of his employment.  The report also revealed that, as early as November 10, 2018 (16 days before his last day of employment with Semler), Gaines had downloaded and accessed a document titled "Hyperion NDA."

45.     Semler has also received a subsequent supplemental report from TLS concluding that, in his last days of employment, Gaines transferred a significant number of Semler files to external drives that he retained following his employment.  Specifically, the supplemental forensic report showed that he retained files regarding case study reports, QuantaFlo test data (which contained protected patient health information and other highly sensitive clinical data), regulatory analysis, market competition analysis, documents regarding particular Semler customers and their

16

contracts, various draft and executed contracts, sales plans and training documents, presentations, sales reports and customer lists for other Semler sales regions, and Salesforce-derived contact lists, among others.

46.    The information that has been shown to have been accessed, copied, retained, and transferred to Gaines's external drives is highly confidential and proprietary Semler information. Gaines's unauthorized access, use, and/or disclosure of this information is not only harmful financially to Semler's business, but threatens to compromise Semler's well-earned goodwill in the industry.  Gaines's use of such confidential and proprietary Semler information for the benefit of Hyperion has already given Hyperion a significant and unfair competitive advantage based upon the work that Ms. Guinasso and Semler have previously performed.  Critically, certain data shown to have been transferred to Gaines's external drives may contain patient health information in clinical trial data that Semler is legally obliged to protect from disclosure.

47.    Upon information and belief, Gaines and Hyperion are using the information Gaines improperly took from Semler to convince Semler customers to switch from Semler's products to Hyperion's products.  Semler customers have reported to Semler that Gaines is using Semler confidential information in his demonstrations of Smart-ABI.  In addition, Semler has learned that Hyperion is contacting Semler customers outside of the Texas region and is concerned Hyperion may be using the information Gaines improperly took from Semler (including, but not limited to, Semler's sales reports and customer lists from regions outside of Texas) to do so.

**E.   Semler's Notice of Ongoing Obligations and Gaines's Disregard for His Ongoing Obligations to Semler**

48.    On February 22, 2019, Semler's outside counsel sent a letter to Gaines reminding him of his legal obligations under the Confidentiality Agreement he had previously entered into with the Company.  The letter detailed Semler's concerns that Gaines had improperly used Semler

17

confidential information to solicit Semler clients and failed to return Semler property and confidential information. The letter asked Gaines to immediately cease and desist from any such behavior and asked that he provide certain information and assurances by February 28, 2019.

49.     On February 22, 2019, Semler's counsel also sent a letter to Hyperion summarizing its concerns that Gaines had violated his continuing obligations to Semler in the course of his work for Hyperion. To date, Hyperion has not responded to Semler's February 22 letter in any manner.

50.     Gaines responded to Semler through counsel on February 28, 2019. In that letter, Gaines failed to provide any of the information and assurances Semler had requested, or to even affirm that Gaines had returned all Semler property and information and would not use or disclose Semler confidential information.

51.     Semler's counsel responded to that letter on March 7, 2019, expressing concerns that Gaines still had not provided even the most basic assurances to Semler. It also pointed out a number of factual inconsistencies and misstatements in Gaines' letter.

52.     To date, Gaines has not returned any of the Semler information that was transferred to his external hard drives. He also has not provided assurances that he would abide by his post-employment obligations to Semler. Gaines had agreed to these obligations both at the outset of his employment with Semler and upon his separation from the Company.

## V.  CAUSES OF ACTION

**Count 1: Misappropriation of Trade Secrets under the Defend Trade Secrets Act,
18 U.S.C. §§ 1836, *et seq.*
(Against Defendants Gaines and Hyperion)**

53.     Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

201934064 v3

54.     As set forth previously, Semler owns confidential, proprietary, and trade secret information related to Semler's business.  Semler's trade secret information includes, but is not limited to, the proprietary details of its products and technologies, such as how its products differ from those of its competitors, technical information relating to its products and technologies, clinical research (including trial data and protected personal health information about patients and other individuals), and case studies.  Semler's trade secret information also includes its organizational models, personnel data, future business forecasts, plans and strategy, sales strategy and forecasts, pricing and billing details, customer lists, customer contract information, customer preferences, customer technical requirements, customer relationship and negotiation history, and potential customer contacts.

55.     The information listed above constitutes trade secrets under the DTSA, 18 U.S.C. §§ 1836 *et seq.*, because they include at least business, technical, and engineering information such as the technical information relating to Semler's products and technologies and its clinical research, in addition to financial, business, and economic information, including but not limited to customer lists, customer contact information, and customer relationship and negotiation history.

56.     Such information is used in interstate commerce by Semler, a Delaware corporation with its principal place of business in California, which utilizes this trade secret information in its operations and business with customers throughout the United States.

57.     None of these trade secrets are provided to the public, and Semler has taken reasonable measures to maintain the confidentiality of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information.  As noted previously, all employees with access to Semler's trade secret information are required to sign the Company's Confidentiality Agreement, which requires among other obligations that the employee "will hold

in the strictest confidence, and will not use (except for the benefit of the Company during my employment) or disclose to any person, firm, or corporation . . . any Company Confidential Information."  Semler also maintains Conflict of Interest Guidelines, which provides that "[u]nauthorized divulging of [confidential] information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended."  Upon separation from Semler, employees are required to return all confidential and proprietary Semler information, and execute a Termination Certification, by which the former employee certifies that he/she has complied with all the terms of the Company's Confidentiality Agreement, has returned all Company property, and "will preserve as confidential all Company Confidential Information . . . , including trade secrets . . . ."

58.     Semler's computer systems are secured through username and password combinations.  Access to Semler's confidential and proprietary information, which is stored in cloud-based secure systems that require authenticated credentials to access, is limited and requires a unique username and password for each user.

59.     The trade secret information that Gaines acquired during his employment at Semler, including the proprietary information regarding Semler's products and technologies and customer contact lists, has actual and potential value to third parties, including Hyperion, because Hyperion manufactures and sells at least one medical device that is a direct competitor to Semler's QuantaFlo device, the information is not generally known to the public and is not readily ascertainable by proper means, and Defendants obtain economic value from using Semler's confidential, proprietary, and trade secret information.  As one example, Semler's customer contact list in the Texas region is the result of at least nine years of cultivating business relationships and networking by Ms. Guinasso and her team at Semler.  Semler has invested significant time and resources to

building its customer relationships, which forms the basis of its customer goodwill and the Company's competitive advantage in the industry.  Semler's trade secret information holds value for its competitors, such as Hyperion, who can use such information to gain an unfair advantage over Semler, disparage Semler's products and technologies, preempt its business strategies, and target its customers and prospective customers.  Upon information and belief, Hyperion has already used such information to gain an unfair advantage over Semler, by leveraging the trade secret information to convert at least 12 of Semler's customers.

60.     Under the DTSA, Gaines has misappropriated Semler's trade secrets by engaging in unauthorized use and disclosure of Semler's trade secrets to provide Hyperion with an unfair advantage and to improperly compete with Semler.  Gaines had agreed to abide by all terms in the Company's Confidentiality Agreement, both at the outset of his employment and upon his separation, agreeing to hold in the strictest confidence Semler's confidential, proprietary, and trade secret information.  Yet Gaines knowingly and intentionally accessed, copied, and retained Semler's trade secret information for use in his position with Hyperion.  Indeed, as reported by Semler's customers, Gaines attempted to get Semler's customers to switch to Hyperion's product while referencing Semler's trade secret information.  And the customers Gaines had contacted were all customers to whom Gaines had been introduced through Semler and about whom Gaines had learned significant confidential information during his employment with Semler.  The identity and contact information of these customers, as well as their preferences, technical requirements, and the details of their negotiation history, contract terms, and general business relationship with Semler, were not known the public or the industry at large. Rather, such information was obtained through and developed by Ms. Guinasso and her team's research and relationship-building over the previous nine years for Semler.

21

61.     Semler's trade secrets were also misappropriated by Hyperion, which derives significant benefit from the use of Semler's trade secrets.  Hyperion's engagement of Gaines appears to have occurred even before Gaines resigned from Semler, indicating that Hyperion knew or had reason to know that Gaines had access to Semler's confidential, proprietary, and trade secret information.  At no time did Semler consent to the use or disclosure of its trade secret information in connection with Hyperion.  To the contrary, the Confidentiality Agreement was drafted to help protect against disclosure of Semler's trade secret information to others (including competitors), by expressly prohibiting disclosure of confidential information to others, both during and after employment, and expressly prohibiting Semler employees from, during their employment, performing any work that was directly related to Semler's business or otherwise conflicted with Semler employees' obligations to Semler.

62.     As described above, Gaines had access to all manner of Semler's confidential, proprietary, and trade secrets information, including but not limited to the highly complex and proprietary details of Semler's products and technologies, Semler's customer contact and prospective customer lists, and Semler's relationships and negotiation history with customers (including its contracts with those customers and its knowledge of those customers' preferences and technical requirements).  The initial investigation conducted by Semler indicates that Gaines deliberately deleted email communications between May 2018 and November 2018 from his email account as well as Company files from his Company-issued laptop and call history from his Company-issued cell phone in an effort to conceal his misappropriation.  Gaines's unauthorized access, copying, and retention of Semler's trade secret information represents additional evidence of Gaines's intent to use Semler's confidential, proprietary, and trade secret information in his position at Hyperion, with whom Gaines had already begun engaging prior to his resignation from

22

Semler.   The documents Gaines improperly retained include proprietary and confidential information related to QuantaFlo and Semler's customer and prospective customer contact lists and contracts.   Such information quickly enables Defendants to promote their direct competitor Smart-ABI device and to target Semler's customers and potential customers for their own benefit.

63.     As shown by (1) the representations of Semler customers who have reported that Gaines has referenced Semler's trade secret information in attempting to get them to switch from QuantaFlo to Smart-ABI and (2) the timing and number of customers that Semler has lost since Gaines's resignation, including 12 customers Semler has confirmed transferred their business to Hyperion, the conclusion that Gaines has disclosed, used, and is continuing to use Semler's trade secrets in his position at Hyperion is justified.

64.     Gaines's misappropriation was willful and malicious because he agreed to safeguard Semler's confidential information both at the outset of his employment by executing the Confidentiality Agreement and again, upon his separation when he signed the Termination Certification.  Gaines's deletion of Semler files and emails from his Company-issued laptop and mobile device, and his unauthorized copying and retention of Semler's proprietary information, is additional evidence that Gaines's misappropriation was willful and malicious.

65.     Gaines's intentional misappropriation, deletion, and unauthorized copying and retention of Semler's confidential, proprietary, and trade secret information, as well as the reports of Semler customers indicating that Gaines was referencing proprietary Semler information in his position with Hyperion, demonstrates that he will continue to use and disclose Semler's trade secrets unless enjoined.

66.     Unless enjoined by this Court, Defendants' misappropriation of Semler's trade secrets will cause great and irreparable harm to Semler, and Semler has no adequate or other

remedy at law for such acts and threatened acts.  Irreparable harm is presumed when trade secrets, such as Semler's trade secret information here, have been misappropriated.  If Defendants are permitted to continue using Semler's trade secrets, Defendants will have profited by their own wrongdoing and Semler's trade secrets may be further disseminated, resulting in damages to Semler that are substantial but not susceptible to precise calculation.  As such, Semler is entitled to a temporary restraining order and preliminary and permanent injunctive relief.

67.     Semler is further entitled to monetary damages to recover its actual loss caused by Defendants' actual and threatened misappropriation and to recover for the Defendants' unjust enrichment, in addition to exemplary damages and attorneys' fees as Defendants' misappropriation is willful and malicious.

## Count 2: Misappropriation of Trade Secrets under the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A (Against Defendants Gaines and Hyperion)

68.     Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

69.     As set forth previously, Semler owns confidential, proprietary, and trade secret information related to Semler's business.  Semler's trade secret information includes, but is not limited to, the proprietary details of its products and technologies, such as how its products differ from those of its competitors, technical information relating to its products and technologies, clinical research (including trial data and protected personal health information about patients and other individuals), and case studies.  Semler's trade secret information also includes its organizational models, personnel data, future business forecasts, plans and strategy, sales strategy and forecasts, pricing and billing details, customer lists, customer contract information, customer

24

preferences, customer technical requirements, customer relationship and negotiation history, and potential customer contacts.

70.     Such information constitutes "trade secrets" under the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code § 134A, because this information includes at least business, technical, and engineering information such as the technical information relating to Semler's products and technologies and its clinical research, in addition to financial, business, and economic information, including but not limited to customer lists, customer contact information, and customer relationship and negotiation history.

71.     None of these trade secrets are provided to the public, and Semler has taken reasonable measures to maintain the confidentiality of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information.  As noted previously, all employees with access to Semler's trade secret information are required to sign the Company's Confidentiality Agreement, which requires that the employee "will hold in the strictest confidence, and will not use (except for the benefit of the Company during my employment) or disclose to any person, firm, or corporation . . . any Company Confidential Information."  Semler also maintains Conflict of Interest Guidelines, which provides that "[u]nauthorized divulging of [confidential] information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended."   Upon separation from Semler, employees are required to return all confidential and proprietary Semler information, and execute a Termination Certification, by which the former employee certifies that he/she has complied with all the terms of the Company's Confidentiality Agreement, has returned all Company property, and "will preserve as confidential all Company Confidential Information . . . , including trade secrets . . . ."

72.     Semler's computer systems are secured through username and password combinations.  Access to Semler's confidential and proprietary information, which is stored in cloud-based secure systems which require authenticated credentials to access, is limited and requires a unique username and password for each user.

73.     The trade secret information that Gaines acquired during his employment at Semler, including the proprietary information regarding Semler's products and technologies and customer contact lists, has actual and potential value to third parties, including Hyperion, because Hyperion manufactures and sells at least one medical device that is a direct competitor to Semler's QuantaFlo device, the information is not generally known to the public and is not readily ascertainable by proper means, and Defendants obtain economic value from using Semler's confidential, proprietary, and trade secret information.  As one example, Semler's customer contact list in the Texas region is the result of at least nine years of cultivating business relationships and networking by Ms. Guinasso and her team at Semler.  Semler has invested significant time and resources to building its customer relationships, which forms the basis of its customer goodwill and the Company's competitive advantage in the industry.  Semler's trade secret information holds value for its competitors, such as Hyperion, who can use such information to gain an unfair advantage over Semler, disparage Semler's products and technologies, preempt its business strategies, and target its customers and prospective customers.

74.     Under TUTSA, Gaines has misappropriated Semler's trade secrets by engaging in unauthorized use and disclosure of Semler's trade secrets to provide Hyperion with an unfair advantage and to improperly compete with Semler.  Gaines had agreed to abide by all terms in the Company's Confidentiality Agreement, both at the outset of his employment and upon his separation, agreeing to hold in the strictest confidence Semler's confidential, proprietary, and trade

26

secret information.   Yet Gaines knowingly and intentionally accessed, copied, and retained Semler's trade secret information for use in his position with Hyperion.   Indeed, as reported by Semler's customers, Gaines attempted to get Semler's customers to switch to Hyperion's product while referencing Semler's trade secret information.   And the customers Gaines had contacted were all customers to whom Gaines had been introduced through Semler and about whom Gaines had learned significant confidential information during his employment with Semler.   The identity and contact information of these customers, as well as their preferences, technical requirements, and the details of their negotiation history, contract terms, and general business relationship with Semler, were not known the public or the industry at large. Rather, such information was obtained through and developed by Ms. Guinasso and her team's research and relationship-building over the previous nine years for Semler.

75.     Semler's trade secrets were also misappropriated by Hyperion, which derives significant benefit from the use of Semler's trade secrets.   Hyperion's engagement of Gaines appears to have occurred even before Gaines resigned from Semler, indicating that Hyperion knew or had reason to know that Gaines had access to Semler's confidential, proprietary, and trade secret information.   At no time did Semler consent to the use or disclosure of its trade secret information in connection with Hyperion. To the contrary, the Confidentiality Agreement was drafted to help protect against disclosure of Semler's trade secret information to others (including competitors), by expressly prohibiting disclosure of confidential information to others, both during and after employment, and expressly prohibiting Semler employees from, during their employment, taking on any work that was directly related to Semler's business or otherwise conflicted with Semler employees' obligations to Semler.

76.     Gaines's execution and signing of the Company's Confidentiality Agreement and Termination Certification gave rise to a duty to maintain the secrecy of Semler's trade secret information.

77.     Gaines's willful and malicious misuse, deletion, and unauthorized copying and retention of Semler's confidential, proprietary, and trade secret information demonstrates that he will continue to use and disclose Semler's trade secrets unless enjoined.

78.     Unless enjoined by this Court, Defendants' misappropriation of Semler's trade secrets will cause great and irreparable harm to Semler, and Semler has no adequate or other remedy at law for such acts and threatened acts.  Irreparable harm is presumed when trade secrets, such as Semler's trade secret information here, have been misappropriated.  If Defendants are permitted to continue using Semler's trade secrets, Defendants will have profited by their own wrongdoing and Semler's trade secrets may be further disseminated, resulting in damages to Semler that are substantial but not susceptible to precise calculation.  As such, Semler is entitled to a temporary restraining order and preliminary and permanent injunctive relief.

79.     Semler is further entitled to monetary damages to recover its actual loss caused by Defendants' actual and threatened misappropriation and to recover for the Defendants' unjust enrichment, in addition to exemplary damages and attorneys' fees as Defendants' misappropriation is willful and malicious.

### Count 3: Breach of Contract
### (Against Defendant Gaines)

80.     Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

81.     As a condition of his employment, Gaines was required to execute the Company's Confidentiality Agreement, which he did on April 10, 2017.

28

82.     The Confidentiality Agreement requires all employees to agree, both during and after their employment, to "hold in the strictest confidence, and . . . not use (except for the benefit of the Company during [the employee's] employment) or disclose to any person, firm, or corporation . . . any Company Confidential Information."  It also require all employees to agree, both during and after their employment, to "hold in the strictest confidence, and not to use or disclose to any person, firm, or corporation, any Associated Third Party Confidential Information." Semler reinforces these obligations through its Conflict of Interest Guidelines, whereby employees agree to avoid "[r]evealing confidential information to outsiders or misusing confidential information.  Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended."

83.     Upon separation from the Company, Semler requires all employees to execute the Termination Certification, in which the former employee agrees that he/she "will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees."

84.     Gaines breached the Confidentiality Agreement by using Semler's confidential, proprietary, and trade secret information in his new position at Hyperion.  As reported by Semler's customers, Gaines referenced Semler's confidential information and the confidential information of associated third parties after his resignation from Semler in his attempts to get those customers to switch from Semler's QuantaFlo to Hyperion's Smart-ABI device.  And in contacting those

29

customers, Gaines also used the identity and contact information from customer lists that were compiled through nine years of effort by Ms. Guinasso and her team at Semler.

85.     The Confidentiality Agreement also requires that an employee agree, upon separation from employment with Semler, to "immediately deliver to the Company, and . . . not keep in [the employee's] possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices)."   This obligation is reinforced upon separation from the Company, whereby the employee certifies in the Termination Certification that he/she does not possess, and did not fail to return, any property or equipment belonging to Semler.

86.     Gaines breached the Confidentiality Agreement through his copying and retention of Semler's confidential, proprietary, and trade secret information.  As the investigation conducted so far by Semler has indicated, Gaines has improperly accessed, copied, transferred, and retained Semler's confidential information.

87.     By signing the Confidentiality Agreement on April 10, 2017, Gaines also agreed not to "engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will [he] engage in any other activities that conflict with my obligations to the Company."

88.     Upon information and belief, Gaines has breached this provision of the Confidentiality Agreement.   One Semler customer reported that Gaines had demonstrated Hyperion's product, Smart-ABI, to that customer while Gaines was still employed by Semler.  The

customer even asked Gaines if it was appropriate for him to market this competing product while still employed by Semler.  The customer reported that Gaines responded that he was not bound by a non-compete and could therefore demonstrate the product, a representation that disregards Gaines's obligations under Section 4.A of the Confidentiality Agreement.

89.     As a direct and proximate cause of the breaches outlined above, Semler has incurred damages.  Semler has been damaged because Gaines has used Semler's confidential, proprietary, and trade secret information almost immediately after resigning from Semler, despite the terms of the Confidentiality Agreement to which Gaines agreed.  In addition, Semler has been damaged by the loss of confidentiality of its proprietary and other information in that Gaines's breaches have permitted Hyperion to benefit from Semler's extensive investment in building its relationships with its customers and compiling its customer contacts and prospective customer lists.  In addition, Semler has been damaged by Gaines' breach of his agreement not to compete against Semler during the period he remained employed by Semler in that Gaines' breach of that provision has led Semler to lose at one customer.

90.     Accordingly, Semler is entitled to judgment against Gaines for compensatory damages and reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code § 38.001.

### Count 4: Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Against Defendant Gaines)

91.     Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

92.     The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a

civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

93.     In connection with his departure from Semler, Gaines knowingly and intentionally accessed, downloaded, copied, took, and/or stole Semler's confidential, proprietary, trade secret and other information, without authorization, from Semler's computers and computer network.

94.     Semler's computers and computer network are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) because they are connected to the internet and used in interstate commerce and communication in the course of Semler's business.

95.     Gaines intentionally accessed Semler's computers and computer network without authorization, and thereafter obtained information from a protected computer in violation of 18 U.S.C. § 1030(a)(2)(C).  Gaines did not have authorization to access Semler's protected computers in at least the following ways: (1) Gaines deleted a large number of Semler files from his Semler-issued laptop and mobile device, including all of his email correspondence from May 2018 through November 2018 from his Semler-issued laptop and email account; and (2) Gaines made unauthorized copies of and retained Semler's confidential, proprietary, trade secret, and other information.

96.     Semler has suffered damages as a result of Gaines's conduct, including from Gaines's unauthorized accessing, copying, and retaining of Semler's confidential, proprietary, trade secret, and other information.  As Semler's investigation is still ongoing, it is unable to state the full extent of its damages, including injury and harm arising from Gaines's unauthorized access, copy, and retention of Semler's confidential, proprietary, and trade secret information. Semler's damages total at least $5,000 in loss in a one-year period, including the cost of responding to the offense through this action and conducting a damage assessment.

**Count 5: Harmful Access to Computer,**
**Tex. Civ. Prac. & Rem. Code § 143.001**
**(Against Defendant Gaines)**

97.     Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

98.     Gaines is liable to Semler under Texas Civil Practice & Remedies Code § 143.001, which establishes a cause of action for "a person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code . . . if the conduct constituting the violation was committed knowingly or intentionally."  Tex. Civ. Prac. & Rem. Code § 143.001(1).  Texas Penal Code § 33.02(a) provides that "[a] person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."  Tex. Pen. Code § 33.02(a).

99.     Gaines knowingly and intentionally accessed Semler's computers, computer network, and computer system for the purpose of deleting Semler files, unauthorized copying and retention of Semler's information, and misappropriation of Semler's confidential, proprietary, and trade secret information.

100.     Gaines's access of Semler's computers, computer network, and/or computer system was without the effective consent of Semler, as any consent given by Semler was not for the purpose of allowing Gaines to delete Semler's files from Semler-issued laptops and mobile devices, or to permit Gaines to copy, retain, and misappropriate Semler's confidential, proprietary, trade secret, or other information.

101.     Semler has suffered damage as a result of Gaines's conduct, including from Gaines's unauthorized accessing, copying, and retaining of Semler's confidential, proprietary, trade secret, and other information.

## Count 6: Tortious Interference with Existing Contracts
### (Against Defendants Gaines and Hyperion)

102.    Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

103.    As described previously, Semler is a medical technology company that focuses on developing, manufacturing, and marketing innovative proprietary products and services and assist healthcare providers in evaluating and treating chronic diseases.   Semler currently markets QuantaFlo, a patented and FDA-cleared vascular-testing product.   QuantaFlo is sold to healthcare insurance plans, integrated delivery networks, independent physician groups, and companies contracting with the healthcare industry such as risk assessment groups, in addition to doctors' offices.   Semler licenses QuantaFlo to its customers, who can elect to license QuantaFlo from Semler on a month-to-month or annual basis.   As of November 26, 2018, Semler had a significant number of existing customers who had licensed usage of QuantaFlo from Semler.

104.    In the course and scope of his work at Semler, Gaines had access to all manner of Semler's proprietary and confidential information, including the highly complex and proprietary details of the Company's products and technology, pricing and billing information, customer and prospect lists (including contact information), the terms of Semler's customer contracts, Semler's relationships and negotiation history with customers and prospects, discounts offered to customers, and business and strategic models and plans.   Just prior to his separation from Semler, Gaines unlawfully accessed, copied, and retained in an external drive Semler's confidential, proprietary, and trade secret information, including but not limited to, the proprietary details of its products and technologies (such as studies relating to Semler's products) and Semler's customer contact and prospective customer lists.

34

105.    Shortly after Gaines resigned from Semler, multiple Semler customers informed the Company that Gaines was contacting them to sell a product called Smart-ABI, a new product competitive to QuantaFlo which was being developed by a company called Hyperion.  The customers who revealed that Gaines had contacted them were all customers to whom Gaines was introduced through Semler and about whom Gaines learned significant confidential information during his employment with Semler.  The identity and contact information of these customers was not known to the public or industry at large.  Gaines has committed independent tortious conduct in that multiple Semler customers informed the Company that Gaines was referencing Semler's confidential information in asking them to switch from Semler's QuantaFlo to Hyperion's Smart-ABI.  In doing so, Defendants have misappropriated Semler's trade secrets for their own benefit.

106.    As a direct and proximate result of Defendants' wrongful conduct, Semler suffered injury that has resulted in actual damages or loss.  Since Gaines' November 26, 2018 resignation, Semler has lost an unprecedented number of customers as a result of Defendants' misappropriation of Semler's trade secrets, including 12 customers that Semler can confirm have transferred their business to Hyperion.  Many of these cancellations occurred very close to Gaines's resignation date.  As Defendants' conduct was committed willfully and intentionally, Semler also seeks exemplary damages as a result of Defendants' actions.

### Count 7: Tortious Interference with Prospective Business Relations
### (Against Defendants Gaines and Hyperion)

107.    Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

108.    Although Semler had existing contractual relationships with a significant number of customers as of November 26, 2018, for the QuantaFlo device, Semler was continuing to develop its customer base and engaging in discussions with prospective customers.  Semler's

35

efforts were made with the expectation that future business and contractual relationships would form with certain prospective customers.

109.    In the course and scope of his work at Semler, Gaines had access to all manner of Semler's proprietary and confidential information, including the highly complex and proprietary details of the Company's products and technology, pricing and billing information, customer and prospect lists (including contact information), the terms of Semler's customer contracts, Semler's relationships and negotiation history with customers and prospects, discounts offered to customers, and business and strategic models and plans. Just prior to his separation from Semler, Gaines unlawfully accessed, copied, and retained in an external drive Semler's confidential, proprietary, and trade secret information, including but not limited to, the proprietary details of its products and technologies (such as studies relating to Semler's products) and Semler's customer contact and prospective customer lists.

110.    Thus, Defendants, and in particular Gaines, were aware of these potential business relationships. Defendants intentionally, with improper motive and without justification or excuse, interfered with and/or are planning or attempting to interfere with these potential business relationships. More specifically, Gaines, on behalf of Hyperion, has contacted numerous Semler customers based on Semler's proprietary customer contacts and prospective customer lists to sell Hyperion's Smart-ABI device, a direct competitor to Semler's QuantaFlo device. Gaines obtained these lists through his unauthorized access, copying, and retaining of Semler's customer contact and prospective customer lists.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered and will continue to suffer incalculable financial loss, loss of goodwill, and loss of the confidentiality of its confidential information and trade secrets, along with other damages.

36

201934064 v3

Because Defendants' conduct was committed willfully and intentionally, Semler also seeks exemplary damages as a result of Defendants' actions.

**Count 8: Breach of Fiduciary Duty**
**(Against Defendants Gaines)**

112.    Semler incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

113.    Under Texas law, Defendant Gaines owed Semler a fiduciary duty while he was an employee of the company.  Specifically, Gaines had a duty to act primarily for of his employer in matters connected with his employment.

114.    By actively soliciting customers of Semler, on behalf of Hyperion, and using Semler's confidential information, Gaines breached his common law duty to Semler.  As a proximate result, Semler has lost business and suffered other tangible damages.

**VI. JURY DEMAND**

115.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Semler hereby demands a jury trial of all issues so triable.

**VII.    PRAYER**

116.    For these reasons, Plaintiff Semler Scientific, Inc., respectfully requests judgment against Defendants as follows:

    a.  Judgment that Gaines and Hyperion have misappropriated Semler's trade secrets;

    b.  Upon application a preliminary injunction and a permanent injunction:

        i.  Enjoining Gaines from breaching or failing to comply with the terms of the Confidentiality Agreement, including the Conflict of Interest Guidelines and Termination Certification;

37

      ii.  Enjoining Gaines and Hyperion from accessing, using, disclosing, distributing, disseminating, or discussing Semler's trade secret information, including, but not limited to, the proprietary details of its products and technologies, how its products differ from those of its competitors, organizational models, personnel data, future business forecasts, sales strategy and forecasts, pricing and billing information, customer and prospect lists (including contact information), the terms of Semler's customer contracts, customer preferences and technical requirements, Semler's relationships and negotiation history with customers and prospects, discounts offered to customers, and business and strategic models and plans; and

      iii.  Ordering Gaines and Hyperion to return to Semler all information, documents, and tangible things in their possession, custody, or control, whether in physical or digital format, including any and all copies thereof, that contain Semler's trade secret information.

c.  For compensatory damages, lost profits, unjust enrichment, restitution, exemplary damages and any other damages to which Semler is entitled in an amount to be shown at trial;

d.  For costs, attorneys' fees, prejudgment interest, and post-judgment interest;

e.  Disgorgement of profits or other payment received by Defendants in connection with the conduct giving rise to this action;

f.  All other relief, in law and equity, to which Semler may show itself to be entitled.

201934064 v3

Dated: April 19, 2019

Respectfully submitted,

**CORNELL SMITH MIERL**
    **BRUTOCAO BURTON, LLP**
1607 West Avenue
Austin, Texas 78701
Telephone:  (512) 328-1540
Telecopy:   (512) 328-1541

Susan P. Burton
State Bar No. 03479350
sburton@cornellsmith.com
Andrew Broadaway
State Bar No. 24082332
abroadaway@cornellsmith.com

**COOLEY LLP**
101 California Street, 5th Floor
San Francisco, California 94111
Telephone:  (415) 693-2000
Fascimile:  (415) 693-2222

Joshua Mates
jmates@cooley.com

Selin Akkan
sakkan@cooley.com

By: _/s/ Susan P. Burton_____
    Susan P. Burton

**ATTORNEYS FOR PLAINTIFF SEMLER
SCIENTIFIC, INC.**

201934064 v3